Good morning. May it please the Court, my name is Stephanie Adraktis and I represent the petitioner Rodtravion Woods. Woods' trial attorney planned to call a crucial witness, Jones, who would have impeached the complaining witness's testimony, identifying Woods as the person who shot him. The state court held correctly that trial counsel was deficient because he failed to lay a foundation, that is, for the impeachment testimony, that is, he failed to ask the complaining witness, Foreman, if he had told Jones that the shooter was another man. Counsel also failed to impeach Foreman with his recent criminal conviction. The only issue in this case is whether Woods was prejudiced, that is, whether there was a reasonable likelihood that at least one juror would have had a reasonable doubt absent counsel's errors. Because Woods provided a credible alibi at trial, at least one juror would have voted to acquit if Jones had testified and Foreman had been properly impeached. Moreover, no reasonable jurist could agree with the Court of Appeals' conclusion that Foreman's identification of Woods was consistent and credible. On the eve of trial, the prosecutor himself told the judge that when he spoke to Foreman about his testimony in the hallway, that Foreman thought the whole thing was a joke. Woods and Foreman knew each other. They both loved classic American cars, and they knew each other through their car clubs. Well, not according to Foreman. Foreman admitted this. He said... Well, Foreman said several different things about... Yes, he did. He was also a really reluctant witness, right? They had to arrest him? Extremely reluctant. He spent the night in jail before his testimony. Yes, he was arrested, refused a subpoena, used obscenities directed at the court, and he was arrested right before the trial. I am confused about the procedural posture of this case and whether the... We had a very recent motion that we received, I think, just on the eve of this argument. Is there currently a new state habeas petition pending? There is a new state habeas petition pending in the Los Angeles County Superior Court, and on June 29th, the... Okay. Hang on. Hang on before you go. Okay. In that state petition, since we're talking about Foreman, is that the state petition? There's, I think, three or four declarations filed in conjunction with that petition... Yes. ...including one from Mr. Foreman. Yes. And so that state petition hasn't been ruled on yet, as I understand it, but it's those declarations are the subject of a motion for judicial notice before us. Yes? Only as attachments to the petition. Not going to the veracity of any of those. The merits of this appeal. The fact that they have been filed in state court is what you want us to take judicial notice of. Yes. And the issuance of an order to show cause. Was that a yes? Yes. The issuance of the order to show cause procedurally was an important ruling because the state court judge in the Superior Court looked at the merits of those submissions and issued an OSC, which is an unusual step. Was that the trial judge? It's not the same person that presided over the trial. Is that what happened in the state court? It goes to a different judge or is this a case? Sometimes. Sometimes. It doesn't automatically go to the same judge? I do not believe it does. And different courts, you know, handle them differently, but I... Right. That's what I was asking. So this is a judge who would have been unfamiliar with the case and then issued an OSC? Issued an OSC. But after looking at the merits, because generally speaking, the state courts don't... Presumed that they looked at the merits. We don't know. He wasn't there, right? Right. And just to follow up, what's the next thing? Where do things stand? The OSC was issued and what's... Respondent was ordered to respond to the petition but requested additional time and there have been a couple of requests for additional time, so there has not yet been a... And this was based on the recantation testimony? Yes. That is the issue that is in the state petition pending. And if that petition is successful, that would moot out our case? It would. We love it when cases go moot. I'm sorry? We love it when cases go moot. Are there five? I understand. Are you handling that case? I assisted in writing the petition and am working with the federal public defender who filed it on Mr. Wood's behalf. You're not a public defender? No, I'm not. You're CJA counsel? Yes. And the FPD is handling it and filing the petition in state court? In Los Angeles. My office is in Berkeley. I couldn't handle the petition in state court there, so they filed it on Mr. Wood's behalf. And they also filed a motion for the indication in the district court. So my understanding... Again, I'm just looking at the motion filed for us for judicial notice on those which we just received. But be that as it may, in response to Judge Kaczynski's question, you said the issue in the new state petition is form and recanting. Yes, it is. Actually, it seems to me a little broader than that. There's four declarations. The two women, Derek Smith, who is allegedly handed off the phone, has emerged, and an allegation about the police involvement in the first identification, is what I'll call it. That's correct, Your Honor. And none of that's been adjudicated in the state court? It has not yet. Okay. In this appeal, however, there... I have one more question. You said something was filed in the district court about it? Yes, there was a motion for an indication from the district court that it would consider reopening Mr. Woods' federal petition to allow us to move for amendment to amend this petition to include those new claims, as well as that ultimately was the request. But the district court recently denied the motion for an indication that it would consider those two procedural motions. Is that the June 29th order? Yes. Is that on appeal? The federal public defender filed a notice of appeal from that denial, and it is now pending. Separately. Exactly. If this court were to issue a certificate of appealability as to that denial, then presumably that appeal would go forward. This could all go away quite soon, right? I'm sorry, Your Honor? This could all go away quite soon if the state court granted the habeas petition. If the state court were to grant habeas relief on the claims that Mr. Woods has presented in state court, then it would... But as a matter of course, recantation evidence is usually not successful, right? This case is different in part because... I'm sorry. I didn't mean to predict anything about this case, but it's not a sure thing that there will be relief because... It's not. Recantation evidence is not unusual. It happens a lot, and usually the state courts are unreceptive. That's correct, Your Honor. That's why the issuance of the order to show cause, I think, was a signal that the state court acknowledged that this case had... Legs. Yes, Your Honor. Yes. Okay. The indications of that, the seriousness of these claims, are present in the existing record in this appeal. Foreman didn't want to identify the real shooter. Anthony Jones's statement that that person was actually a rival gang member would have drawn retaliation. This is also not unusual, as I understand it, in state court. It may happen in federal court as well where gang members don't want to testify. You have to track them down and jail them. Even when there are different gangs, there's a, I won't say code, but basically an ethic. That's true. That you don't testify. Right. So that doesn't make this case all that unusual. I know of other cases where this has happened. It may not be that usual, or is it, that the only evidence against the individual is the testimony of that gang member? That's correct. There's no physical evidence of any kind? Right. Is that usual or unusual? Well, it depends on the case. I mean, they vary so dramatically. In this case, there isn't any physical evidence tying Mr. Woods, and he did have alibi witnesses who testified. Well, aside from that, I'm talking about the prosecution's case. The case against him was solely the testimony of Mr. Foreman. Based on Mr. Foreman. That's not unusual either, right? Taylor v. Maddox was just exactly like that, if I remember correctly. What was different in this case, though, is that if one lines up the preliminary hearing transcript with the trial transcript, both Mr. Foreman's testimony, there's such dramatic differences that it's very clear that Mr. Foreman is lying. He said at the preliminary hearing that he didn't associate Mr. Woods with any kind of green car or any car at all. Bringing you back to the current petition, we've taken an important detour, but, I mean, we would have to hold that the court of appeal was unreasonable in its determination, right? Yes, under the 18th. And, as you know, the Supreme Court has told us it's a pretty steep bar. Yes. And I know opposing counsel will hammer that pretty hard. So why don't you do your best to persuade us that that bar has been adhered to, without regard to the recantation, which, of course, is a different petition. On the existing record in this appeal, the state court was objectively unreasonable to state that when it clearly was not. We've already discussed Mr. Foreman being arrested, his reactions to the subpoena, and what he said to the prosecutor before trial. But you can look at the preliminary hearing testimony, compare it to the trial testimony, which were both rather brief, and he's saying different things under oath. He said he didn't know him. He said somebody told him they'd been looking for him for a year. He said he'd just met them. He said, we've been a member of these car clubs. Those are the inconsistencies that seemed most apparent to me when Mr. Foreman was asked whether he knew Mr. Woods or not. Right. He initially said he'd never seen him before. Have you seen him before? No. Then later he said, oh, well, we had a confrontation. It could have been weeks, months before. Then he says at trial we had this face-to-face confrontation. It's so inconsistent that it's impossible to believe what this man had to say. I mean, he made it clear that under oath he was willing to say multiple different things about the same subject. And I do want to point out the crucial nature of the testimony about the green car, because when first interviewed at the hospital, Mr. Foreman said that the shooter was a person named DMACC or BMACC. Now, if he knew Woods, as he later said he did, why would he say something like that? He was giving the police the runaround from the first moment. Well, it could have been a misunderstanding by the officer as to whether it was D or B he said. But Mr. Woods has never gone by either name, whether it's a D or a B. There's no evidence that he ever used the name DMACC or BMACC. So from the beginning, if Foreman really thought that Woods was the shooter, it would have been easy for him to identify him because they knew each other through their car clubs. But instead, he said, oh, it's some guy named DMACC or BMACC. Then later he says, oh, it's a person who drives a green Camaro that belongs to the car club. At the preliminary hearing, he flatly denied that he'd ever associated Mr. Woods with a green Camaro or any kind of car. The Court of Appeals gave three reasons that the alibi was undermined. One was that the testimony of the victim was resolute and consistent, and you've just been talking about that. Another was the cell phone pinging off the towers. Do you want to talk about that? Yes. In the brief, I attempted to explain this, but the key flaw in the Court of Appeals reasoning is that they said that Mr. Woods had testified that he'd retrieved his phone in Ontario, and that is flatly contradicted by the record. No one testified that Woods got his phone back in Ontario. But the bigger problem is the 913 call, because that doesn't rely on witness testimony, really, right? Well, there's a witness to testify about where that call pinged, that it started in L.A., and the phone was moving east, right? And is it your ‑‑ and I understand that the Court of Appeals thought that that was inconsistent with his alibi witnesses who said he was at the restaurant at 913. They did not. The question is, isn't that what the Court of Appeals thought, that there was that inconsistency? And, in fact, those witnesses said he got there at about 8 but left to go get the phone to meet Derek Smith, and so pursuant to the alibi witnesses, in other words, the 913 testimony about the cell phone pinging, it seems to me is consistent with the alibi witnesses if the alibi witnesses are believed. Yes, as well as the testimony of the defense expert who pointed out this exact problem. He said no one testified that Woods retrieved his phone in Ontario, and, in fact, he said he drove back toward Los Angeles to get the phone, and so the 913 phone call in the cell tower location that it used was consistent with Woods' testimony. Isn't the 735 call more problematic for your client? It's not what the Court of Appeals relied upon, but what about that call? The 735 call, Your Honor, I don't recall the tower location of that. Well, it indicates that the phone was back in L.A. Right. Oh, I think Your Honor is referring to what they're saying was the voicemail retrieval call. And the question is, why would Derek Smith have been retrieving Mr. Woods' voicemails? If the phone was left with Derek Smith, which is what your client's testimony is, why would somebody else be checking the voicemails? Mr. Woods testified that in order to check the voicemail on that phone, all you have to do is push a button. So if Mr. Smith pushed the button on the phone, that's how. . . In other words, he wouldn't have needed a password. Right. Smith wouldn't have needed a password, so he could have checked the voicemails. Do we have any indication about why he would have done that or whether he did that? Or Smith didn't testify, right? Right. He did not testify. So we don't know that. But the voicemail retrieval that shows up on the records is really only a connection to the wireless service T-Mobile's routing number. Both of the experts testify to that. The 735 entry on the cell phone records just shows a call being made to a routing number that allows a person to access their voicemail. And do we know from the testimony that that call to check voicemail came from Woods' own cell phone? No. In fact, both of the experts had different takes on this. The expert that testified for the defense, Mr. Cosgrove, said that it was not necessarily, and he didn't think it did come from the handset that was assigned to Woods. He said that anyone can call that number from any phone and retrieve voicemails. So it's not, there's no indication. Thank you. Thank you, Your Honor. Well, I'm not sure where that gets you. I mean, you've come up with a somewhat plausible way of piecing together the events, but why is the Court of Appeal unreasonable in making, not accepting these inferences? They're saying, you know, nobody reasonably checks somebody else's voicemail, right? Nobody really checks other people's voicemail. They might use the phone to make a call, you know, if they have access and they need a phone, they might use that, but who does that? Why would that be? Why wouldn't the, why isn't the Court of Appeal reasonable in thinking that's just not plausible? You know, it's a possibility. It's something you can raise to the jury, and if the jury buys it, then, you know, then there's reasonable doubt, but you have a jury that convicted. The Court of Appeal's reasoning about Mr. Woods' alibi wasn't dependent on that 735 phone call. It was dependent on the erroneous assumption that he picked up his phone in Ontario. That was what they based their ruling on, so they didn't focus on the 735. They may not have mentioned it, but, you know, this raises an interesting question. You know, if the state court doesn't give a reason, then we have to, under Harrington, we have to make up reasons. I mean, so long as they're consistent with the record, we have to sort of imagine what the reasons are. This is a more limited case, a situation where they give some reasons. There is other evidence in the record that supports that reasoning, and what happens to that? Do we just sort of ignore it and say, well, they didn't rely on that, and therefore, whatever inferences you can draw from it are ignored, or do we have to say, look, they may not have mentioned it, but consistent with Harrington, we look at the entire record, and we fill in the gaps, even things they didn't mention specifically, are things that we have to assume that they thought about. Your Honor, I think that would expand the ruling of Harrington, which is focused on post-conviction. Look, I'm not looking to expand Harrington, believe me. I didn't like it much either, but, you know, we are where we are in the judiciary, and I have to think about it in terms of what would the Supreme Court, you know, the justices who decided Harrington say. And just looking at Harrington, you know, it adopts a very sort of broad rule that we have to essentially attribute motives and thoughts to the state courts, and I don't know why we are precluded from doing that when they have a speaking order. Your Honor, I can't say the court is precluded from it, but in this instance, one can look at the actual basis of the state's court's reasoning, and it might be. But was there something wrong with the actual basis of the reasoning, aside from the fact that they could have used a different reason? Was their factual analysis incorrect? Yes, for the reasons discussed in the brief, the finding that Woods claimed that he got his phone in Ontario was unsupported by anything in the record. It's not undermined by the 913 call to his dad. It's not at all. For sure, because it's not inconsistent with what the alibi witnesses said. I think, though, in response to Judge Kaczynski's inquiry, I tend to agree with him about Harrington, and so I went to the 735 call. I don't know what we do. I don't think anybody knows what we do consistent with Harrington. But what I'm understanding from you is that the premise of my question was mistaken. I understood from the briefing that the 735 call was problematic because the voicemail was checked, and that that meant that Derek Smith would have been checking the voicemail, which seems a little odd, and I understand from the briefing that he wouldn't have needed a password. But quite apart from that, what you're telling me is there isn't location information on that, and that Mr. Woods could have been checking his own voicemail at 735. Right, Your Honor. In other words, so the call wasn't placed from his own cell phone. That's where I think that I missed the boat. If one reads the testimony of the cellular expert for the prosecution and for the defense, it's consistent that neither of them is claiming that that call connected to a tower because it's a voicemail. That part I understood, but… Also, there's no evidence because I focused on this as well. Was there testimony that a person entered the password? There was no testimony that a person entered the voicemail password because the only indication from that line on the cellular records is that there was a connection with a phone number that's a routing number. Yes, but now get to the third point, which is what I'm trying to get to, if you would. My understanding of these things is that if you have the cell phone, you don't need a password. You can call the number and it goes right through. But if you don't have the cell phone that's assigned, that has a SIM card that has assigned that number, then you do need a password. Then you do need it. You do need a password. But neither expert was able to say that a password was entered or not. So we can't tell whether the voicemail was checked remotely or from Woods' own cell phone is what I'm understanding you to say today. So what is your construct? I mean, what is your construct? That your client used some other phone to check his voicemail and used the password? Is that what it is? Ultimately, the construct is that that call doesn't give us any information about where Mr. Woods was at 735, so it's just not useful. Well, no, we know one of two things happened. The call came in. So it either came in without a password from wherever the cell phone was, or it came from another location and somebody used the password. So if it was from another location with a password, it had to have been your client because presumably other people don't have the password. If it is from the cell phone, then you wouldn't need the password, right? Right, because you could just press the button. Although, don't you need a password to get into the phone? Mr. Woods testified that the way his phone was set up, that it had the button set up so that if you pressed the voicemail retrieval button, it automatically connected. It would bypass the password. So it really doesn't give us any information about Mr. Woods' location. The 735 call probably, if one wanted to speculate about the court of appeals reasoning, maybe they skipped that in their analysis because it doesn't tell us anything about where Mr. Woods was. I think you answered my question. I have one more question for you. What's your suggestion as to what we do about this case given the pendency of the state court petition? Well, the court has several options. Some that come to mind, I had initially moved to stay these proceedings so that we could go back to state court and exhaust an attempt to reopen the petition in the district court. The court could consider staying the proceedings in this court. The court could consider remanding this case to the district court for consideration of a motion to reopen the petition and to amend it. Not bad if we could decide it in your favor. Your Honor, I would be happy to receive that decision. You have no strong preference for what we do? Number three, Your Honor, my client would clearly prefer a resolution in his favor in this court, but we're prepared to go the long way and litigate the new claims as well. Thank you, Kathy. Thank you. That may be the wrong choice. Well, right. You know, not everybody has the same view of what our role is, whether it's to anticipate what the Supreme Court has not done and extend a bad rule even further or whether it's to do what's right until the Supreme Court does do that. That's another possibility. Or to give the Supreme Court a chance to make a bad rule worse? No, not to give a chance. Oh, you know, you can't stop the Supreme Court from making bad law, but you can't make bad law worse. I just wish there were a button to turn off. These little judges differ, right? Are we going to hear from the State? I hope. If we give them a chance to start. May it please the Court, good morning. Affirmance because in this case there was no strictly prejudice in at least three ways, and the Court has already discussed them. Number one, victim Foreman's identification was resolute and stable and overwhelmingly consistent. Where do you get to overwhelmingly consistent? He said he'd never seen him before. Then he said he'd had a fight with him a couple of weeks before. Then he'd only heard of him. Totally inconsistent. I would argue as follows, Your Honor. Four days after the shooting, Foreman told police at least seven factors about the shooter. Number one, he had tattoos of stars on his body. Counsel, can I interrupt you? Are you now speaking about the second trip? I don't know whether four days was the police officer's first visit to him or the second visit to him. Foreman was taken to the hospital from the scene. He stayed for three weeks. Right. Within the first two days, he submitted two statements to the police while in critical condition. On the fourth day. So this is now the second time he talked to the police? Yes. Okay. But this is four days after the shooting. Right. By or within those four days, he'd identified at least seven factors. He said, one, that the shooter had star tattoos on his forearm. Two, he said that the shooter was in a black car with Hello Kitty logo car seat covering. He said, three, that the shooter usually drove a green Camaro. Four, he said that the shooter was a member of the local Flawless Car Club. Five, he said after the shooting, the shooter said from the driver's seat, my name is B. Mack from Inglewood family, which was Foreman's rival gang. Six, he said he saw the shooter at a local car wash with a woman in the same black car 30 minutes before the shooting. Seven, he said the shooter was not a stranger. Now, that day on July 7th, Foreman in critical condition was shown a six pack, which did not include petitioner's photo, and he did not identify anyone. The very next day, July 8th, five days after the shooting, he was shown a fresh six pack, which did include petitioner's photo. And he not only identified petitioner's photo, as the court knows, he said, I'm 100% sure that's the shooter. And now we have a declaration where he says this is nonsense, I was lying. We, of course, have filed an opposition because the court can't take judicial notice of something that's still pending. It has not been adjudicated. Typically the federal court doesn't do anything until the state court is finished, right? It has finished for purposes of this. What obviously is occurring is that they're trying to relitigate new matters to get around Penholster. They're trying to further exhaust, but for purposes of this case, this court can forge ahead. Do I have anything in the record that tells me, I have questions for sure about these declarations and some of them, I don't know why they wouldn't have been attainable at the time, certainly the two women who were in the car, I have questions about that. But do we have anything that explains in our proceeding when Derek Smith came forward, when Mr. Foreman came forward and said none of this was true? None of that has been presented either to the district court or to this court in this case. And it hasn't been litigated in the state court? It has not been litigated in the state court. The effort is, it seems on multiple fronts, petitioner has tried to expand the appellate record for this case. Number one, they requested stays of briefing here in order to go back into the district court to get a Rule 60 motion for indicative relief. After that was thoroughly briefed, the district court, which is the June order, said under this circuit's law, I hate to put it this way, but it's like putting lipstick on a pig. This court is required to issue a certificate. If you don't want to, if you hate to put it that way, think of a different way. OK, but the point being the court said under this circuit's law that this motion for indicative ruling is in essence a second or a successive petition which requires preauthorization. So it denied the motion without prejudice to this court issuing a certificate of appeal ability. And consequently, this court has started a new case number to assess whether or not there should be review with respect to the Rule 60 ruling. So that's one train on the track and that's being handled by the federal public defender. The same federal public defender is the federal public defender who after the district court's ruling in this case, after the certificate of appeal ability was issued by this court, after all of that activity, then filed a superior court habeas petition to which we have asked the court to reject or deny the judicial notice, but specifically as the records show pertaining to their motion as well as our opposition. The superior court issued day and next day rulings which one said, I'm going to issue an order to show cause. And then the next day, I believe they were November orders, said, I'm busy. I don't have time to look at all of this stuff. So I'm going to give myself a continuance to wrestle with this. As things stand, which we've asked the court to reject the motion for judicial notice, but as things stand, the Los Angeles County District Attorney's habeas team has filed and was granted in July of this year a continuance. As of this argument, that continuance is until September 24th. But to be brutally candid with the court, the district attorney has represented to me that on or off the record, the superior court's not going to really do anything until this court rules in this case because they, like this court, believes that, let me see what the ninth circuit is going to do first. But that, again, all the reasons why the court should not take judicial notice. You were trying to tell me that I should consider, that we should find that your client was consistent in identifying Mr. Woods. Do you want to get back to that? Yes. I was saying in addition to those seven factors that I've already identified. What about the, what your statement, client's statement at Excerpt of Record 95, where he said he didn't know the defendant prior to that day. He knew of him. And what does that mean? Like, I don't know him like that, but I know of him. Had you seen him places before? No. Is that consistent? Your Honor, first, that was at the preliminary hearing. Second, the jury was aware. Wherever it was, is it consistent? It is consistent because on cleanup, the prosecutor before the jury in this case said to Foreman on the stand, let's dive deeper into the preliminary hearing. And he later made clear that he either, A, was mistaken as to what he had heard, but he pointed out in the same preliminary hearing, which was before the jury, that, in fact, I did have a prior riff with him. The first time in the preliminary hearing, he'd never seen him before. And then the prosecutor got him to say, yes, oh, that's right, I did see him before. And that's consistent. It is largely consistent, and it was before the jury. The jury was assessing all of this. The jury was additionally assessing Foreman with respect to character in terms of him being an admitted gang member. They were assessing his credibility with respect to him testifying in custody. They were assessing his credibility with respect to the fact that he had issued. But, counsel, aren't we assessing whether the court of appeals ruling was reasonable? Yes, and our contention, of course, as briefed and as argued today, is that reasonable arguments exist to show that it was objectively reasonable. Did the court of appeals use the word unwavering? It was largely consistent. So my question, it's truly a sincere question, didn't they use the word unwavering? They used unwavering, and the district court pointed that out, too, and I believe the district court pointed out a footnote that said the only bone of contention there would be, of course, if you allow in, for the fact that Anthony Jones was prepared to say what he said. But it's not, I'm just looking at, this is Foreman compared to Foreman. Foreman, in addition to the factors identified at the hospital four days after the shooting in critical condition, he then identified him without question at the preliminary hearing, which the jury knew, which was four weeks after Petitioner was arrested on July 21st. And then ten months after the shooting at trial, Foreman, yet again, despite not wanting to be there, despite testifying in custody, despite admitting that he had smoked marijuana seconds before the shooting, and he had smoked a blunt earlier that day, despite admitting a prior riff with the shooter two weeks earlier, despite all of that, he still testified at trial that Petitioner was my shooter. The jury was aware of all of that, as well as the inconsistencies at the preliminary hearing, and still made a credibility call, mindful of the fact that Petitioner himself admitted his felonies, mindful of the fact that his mother, of course, would be biased. And this is also unwaveringly consistent. When he was asked at the preliminary, is there any connection that you know of between the defendant and a green Camaro? I know it's from a car club, but I didn't really know what car he drove. Then later, and do you remember what kind of car the defendant drove? Oh, yes, a Camaro. What color green? That's consistent, too? It's consistent when you look at the totality of the circumstances, which this court does every day. And it's consistent... Well, I've looked at it every day, and I find this totally inconsistent. Well, we would submit that it's consistent to say four days after the shooting, Petitioner's my shooter. It's consistent to say, ultimately, at the preliminary hearing, that's my shooter. It's consistent to say at trial, that's my shooter, despite the fact I don't want to be here, despite the fact I'm potentially a rival gang member, despite the fact I smoked marijuana seconds before the shooting, despite the fact that we had a prior riff two weeks earlier, despite the fact that the jury was able to assess all of that. And it's just not reasonable... That may be true. The jury may well accept inconsistencies. They have a right to do that. No question about it. The question is whether the Court of Appeals was correct when it reported the facts and said they were consistent, unwaveringly consistent, when on the critical facts, they were inconsistent. Now, you may be able to explain the inconsistencies, and you may be able to sell a jury on them, particularly if his counsel's been ineffective and hasn't presented the key defense witness. Then you can much more easily persuade a jury that inconsistencies don't matter. Again, Your Honor, we would strongly submit that there are reasonable arguments in this case, under Harrington, to affirm, because the state court was not wrong under existing law, beyond any possibility of fair-minded disagreement. And of course, that is the test under Harrington. Okay. Thank you. Counsel will give you two minutes. Thank you, Your Honor. Simply to add to the discussion regarding the consistency of Mr. Foreman's testimony, the testimony about the green Camaro was critical, because after Mr. Foreman had initially said that the shooter was DMACC or BMACC, and that was eliminated as a person who committed the crime, the way that he identified would... He doesn't have to be consistent, right? Witnesses often give inconsistent statements, and jurors pick through them, and they say, we believe this one. He testified, right? That's true, Your Honor. So, why is the court of appeal unreasonable in saying the jury here chose to believe this statement? What's most striking in this case is the brevity of Mr. Foreman's testimony, and how under oath he said flatly different things about the same subject. Maybe, and it's the kind of thing that you would argue to a jury and say you shouldn't believe him, because look how little he has said, and look how he made these inconsistent statements, and you know, you could ask him, were you lying then, or are you lying now? You know, the famous cross-examination question. But why does that undermine the verdict? It's one thing if the jury doesn't hear about it. You know, there are inconsistent statements that are withheld, or the lawyer forgets to put them before the jury, but if the jury actually sees them, what's the beef? Well, there's two issues, Your Honor. One is that Mr. Mizrahi... No, no, why don't you answer my question. The first answer is that trial counsel didn't bring out all these inconsistencies. He did an inadequate, in my view, cross-examination. I'm sorry, the jury didn't hear them? They didn't hear all of them. He was not confronted with every inconsistency. If one reads the trial transcript and compares it to the preliminary hearing transcript, counsel confronted him with a couple things, but not all the things we're talking about today. And secondly, as the course pointed out, when trial counsel is ineffective as he was, he did not present the evidence that would have allowed a full and fair jury consideration of the testimony of Mr. Foreman. If the witnesses who could have testified had testified... Well, you're on the prejudice prong, right? And the question is not, could he have done more? Yes, he could have done more. The question is, would the more have made a difference? And we're not even here to decide that question. We're here to decide the question, would the court of appeals judges have to have been drunk or crazy to find that more wouldn't have made a difference? That's more or less a test, isn't it? A test is drunk or crazy? You think that's a test? I'm sorry, Your Honor. You think the test is whether the court of appeals judges were drunk or crazy? No. What is the test? Whether there was a reasonable likelihood that at least one juror would have held a reasonable doubt. No, that is not the test. The test is whether the court of appeals judges could have reasonably thought that no juror would have voted differently. We're not assessing the situation on the ground in the trial. What we're assessing is the reasonableness of the court of appeals judges' decision. The reasonableness of their decision. Which drunk or crazy people don't make. One judge, one juror might have come to a different conclusion had he heard the key evidence that the ineffective counsel failed to put in the record that Mr. Foreman had told Mr. Jones that the defendant wasn't the one who did it. That's the evidence we have to look at. Is that right? Is it might? Is it what they might have? I thought that they would have. Quite different. Likely would have. Not might have. Might have is a very weak standard. That they aren't reasonable in thinking that no reasonable juror would have. If you think it's correct that judges had to be drunk or crazy, tell us that. I don't agree with that part. But I recognize that the court of appeals decision is reviewed for objective reasonableness and the standard that they were reviewing was a reasonable likelihood standard. We do have to put those two things together. But in this situation, Mr. Jones' testimony was credible. He was a good friend of Mr. Foreman's, had been friends with him for seven years, and he said, I was with him when he had a confrontation with this other gang member at a mall. He gave a specific place where it occurred and he said that that was the person who shot Mr. Foreman and they were involved in a dispute. So there is a reasonable likelihood of a different result in context of a witness whose testimony was so inconsistent over time. Thank you, counsel.
judges: Reinhardt, Kozinski, Christen